IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

**MANUEL ORTIZ,**

    Plaintiff,

    v.

**COMMISSIONER OF SOCIAL SECURITY**,

    Defendant.

Civil No. 18-1998 (BJM)

## OPINION AND ORDER

    Manuel Ortiz ("Ortiz") seeks review of the Commissioner's finding that he is not disabled and thus not entitled to disability benefits under the Social Security Act (the "Act"). 42 U.S.C. § 423. Ortiz contends the Commissioner's decision should be reversed because the administrative law judge ("ALJ")'s residual functional capacity ("RFC") finding and step five non-disability determination were not supported by substantial evidence. Dkt Nos. 3, 25. The Commissioner opposed. Dkt No. 28. This case is before me on consent of the parties. Dkt Nos. 7-9. After careful review of the administrative record and the briefs on file, the Commissioner's decision is **affirmed**.

## STANDARD OF REVIEW

    After reviewing the pleadings and record transcript, the court has "the power to enter a judgment affirming, modifying, or reversing the decision of the Commissioner." 20 U.S.C. § 405(g). The court's review is limited to determining whether the Commissioner and his delegates employed the proper legal standards and found facts upon the proper quantum of evidence. *Manso-Pizarro v. Secretary of Health & Human Services*, 76 F.3d 15, 16 (1st Cir. 1996). The Commissioner's findings of fact are conclusive when supported by substantial evidence, 42 U.S.C. § 405(g), but are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts. *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999); *Ortiz v. Secretary of Health & Human Services*, 955 F.2d 765, 769 (1st Cir. 1991). "Substantial evidence means 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Visiting Nurse Association Gregoria Auffant, Inc. v. Thompson*, 447 F.3d 68, 72 (1st Cir. 2006) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The court "must affirm the [Commissioner's] resolution, even if the record arguably could

justify a different conclusion, so long as it is supported by substantial evidence." *Rodríguez Pagán v. Secretary of Health & Human Services*, 819 F.2d 1, 3 (1st Cir. 1987).

A claimant is disabled under the Act if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Under the statute, a claimant is unable to engage in any substantial gainful activity when he "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). In determining whether a claimant is disabled, all of the evidence in the record must be considered. 20 C.F.R. § 404.1520(a)(3).

Generally, the Commissioner must employ a five-step evaluation process to decide whether a claimant is disabled. 20 C.F.R. § 404.1520; *see Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987); *Goodermote v. Secretary of Health & Human Services*, 690 F.2d 5, 6–7 (1st Cir. 1982). In step one, the Commissioner determines whether the claimant is currently engaged in "substantial gainful activity." If so, the claimant is not disabled. 20 C.F.R. § 404.1520(b). At step two, the Commissioner determines whether the claimant has a medically severe impairment or combination of impairments. 20 C.F.R. § 404.1520(c). If not, the disability claim is denied. At step three, the Commissioner must decide whether the claimant's impairment is equivalent to a specific list of impairments contained in the regulations' Appendix 1, which the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. § 404.1520(d); 20 C.F.R. § 404, Subpt. P, App. 1. If the claimant's impairment meets or equals one of the listed impairments, he is conclusively presumed to be disabled. If not, the evaluation proceeds to the fourth step, through which the ALJ assesses the claimant's RFC and determines whether the impairments prevent the claimant from doing the work he has performed in the past. An individual's RFC is his ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. 20 C.F.R. § 404.1520(e) and 404.1545(a)(1). If the claimant is able to perform his previous work, he is not disabled. 20 C.F.R. § 404.1520(e). If he cannot perform this work, the fifth and final step asks whether the claimant is able to perform other work available in the national economy in view of his RFC, as well as age, education, and work experience. If the claimant cannot, then he is entitled to disability benefits. 20 C.F.R. § 404.1520(f).

At steps one through four, the claimant has the burden of proving he cannot return to his former employment because of the alleged disability. *Santiago v. Secretary of Health & Human Services*, 944 F.2d 1, 5 (1st Cir. 1991). Once a claimant has done this, the Commissioner has the burden under step five to prove the existence of other jobs in the national economy the claimant can perform. *Ortiz v. Secretary of Health & Human Services*, 890 F.2d 520, 524 (1st Cir. 1989). Additionally, to be eligible for disability benefits, the claimant must demonstrate that his disability existed prior to the expiration of his insured status, or his date last insured. *Cruz Rivera v. Secretary of Health & Human Services*, 818 F.2d 96, 97 (1st Cir. 1986).

## BACKGROUND

The following is a summary of the treatment record, non-examining consultative opinions, and self-reported symptoms and limitations as contained in the Social Security transcript.

Ortiz was born on December 23, 1961, has two years of undergraduate studies, is able to communicate in English,[1] and worked as an accounts collector for almost thirty years but quit working on December 31, 2012[2] at age 51 due to the exacerbation of his depression. Tr. 56, 68, 74, 85-86, 149, 574, 577.

*Treating Physicians*

**Dr. Eduardo Caussade ("Dr. Caussade")**

Ortiz began treatment with psychiatrist Dr. Caussade on February 1, 2013. As evidenced in the handwritten (somewhat legible) treatment notes on record, Ortiz reported then, and in monthly follow-up visits between April 2013 and December 2014, that his symptoms started on or about late 2011, exacerbating in December 2012, and included feeling isolation, insomnia, anxiety, restlessness, depressed mood, forgetfulness, difficulty concentrating, irritability, bad temper, impulsivity, anhedonia, low self-esteem, and feelings of helplessness and hopelessness. Dr. Caussade diagnosed major depressive disorder, single episode, and prescribed medications (Zoloft and Ambien). Ortiz reported that he stayed home, didn't like to watch TV, and avoided participating in group activities. After starting medications, the symptoms remained but he slept better. Exh. 6F at Tr. 152-158, 588-596; Exh. 8F at Tr. 160-169, 598-607. In July 2014, Ortiz

---

[1] The ALJ states in the decision that Ortiz is able to communicate in English (Tr. 56) but Ortiz reported that he cannot. Tr. 488.

[2] Ortiz formally stopped working on January 3, 2013, as per a work certification offered as an exhibit to the ALJ. Tr. 85.

reported hearing voices calling his name. Dr. Caussade prescribed Abilify for seven days, to which Ortiz reported in August being effective, although his other symptoms remained. Exh. 8F at Tr. 168, 606.

Dr. Caussade submitted a Psychiatric Medical Report for the Disability Determination Program, dated April 4, 2014. Dr. Caussade summarized that Ortiz felt sad, depressed, anxious, and irritable. He spent most of his time alone at home bad-tempered, and refused to go out or participate in group activities. Ortiz's wife took him to all his appointments. As of the last examination, Ortiz looked disheveled, spoke in a low voice with slow speech, and had poor eye contact and psychomotor retardation. His mood and affect were depressed, anxious, and somewhat restricted. He showed low self-esteem, and a sense of helplessness and hopelessness. Ortiz was coherent and oriented in person and place, but only partially as to time. His immediate and short-term memory were poor and his recent memory was impaired, but his long-term memory was intact. He demonstrated poor elaboration of ideas and blocked thoughts. He had some delusional thinking, but was not actively hallucinating. Ortiz's ability to concentrate and his attention span were poor. He was easily distracted. Ortiz also demonstrated difficulty following instructions. His insight and judgment were poor, with a history of impulsivity.

As to activities of daily living, Ortiz could not do house chores and was escorted to all appointments. In social functioning, Ortiz wanted to be alone and avoided socializing. He could not tolerate criticism. He became anxious and irritable around groups of people, and could not tolerate crowded places. As to task persistence, Ortiz became easily distracted, was unable to focus attention on or persist at a task, and in his opinion was unable to complete a normal workday without interruption. Ortiz was under medications and psychotherapy with good compliance but only minor symptomatic relief. Prognosis was poor, and it was unknown if he could handle funds. Exh. 3F at Tr. 577-582.

By May 2015, Dr. Caussade noted that medication and psychotherapy had offered only minor symptom relief. Exh. 21F at Tr. 365. Monthly follow-up notes from January to December 2015 show that Ortiz continued to be depressed, sad, anxious, restless, anhedonic, lacked energy, irritable, helpless, and hopeless. He was frustrated that he was unable to function as before and fearful that something might happen (like dying in his sleep). He showed poor impulse control. He spent the day at home, and would sometimes nap. He reported occasional episodes of disorientation. Dr. Caussade noted that Ortiz spoke in a low pitch with poor elaboration of ideas.

He also showed a depressed and anxious mood, restricted affect, poor personal hygiene, fair to poor judgment, and poor insight. Ortiz had good contact with reality and showed no signs of hallucinations. Sometimes he'd walk around the neighborhood, and try to do things around the house. He was always accompanied in his outings by his wife and sons, who also administered his medications. He was compliant with his medications. Exh. 21F at Tr. 364-367.

Progress notes from 2016 are mostly illegible, but I note that the symptoms described in the prior treatment years remain. Ortiz underwent gallbladder surgery in May, and notes from June indicate that Ortiz was not taking his psychotropic medications because of the surgery and renal failure. He was only undergoing psychotherapy. In July, Dr. Caussade instructed Ortiz to continue taking Ambien and Klonopin. Exh. 21F at Tr. 368-370. By December 2016, symptoms continued the same, including difficulty concentrating, feelings of isolation, and irritability. Exh. 22F at Tr. 908.

Dr. Caussade prepared in April 19, 2016 a second assessment, in which he check-marked that no remission was observed in Ortiz's clinical depression. Ortiz was not oriented in time. His recent memory was fair to poor, and he was unable to perform when tested or his immediate and short term memory. His attention span and ability to concentrate were poor, and he was easily distracted. He became irritable during testing. Prognosis was poor. Ortiz was unable to manage funds. Dr. Caussade opined that Ortiz was moderately limited in his ability to understand and remember very short and simple instructions, markedly limited in his ability to sustain concentration and persistence, and markedly limited in his ability to socially interact except no significant limitation in his ability to ask simple questions and request assistance. In Dr. Caussade's opinion, Ortiz was unable to complete a normal work-day without interruption, making it very difficult for him to engage in gainful activity.  Exh. 17F at Tr. 838-844.

Notes from January 2017 reflect that Ortiz continued with symptoms of depression and anxiety. He continued looking disheveled, was disoriented, fearful, and needed help from others. Exh. 22F at Tr. 909.

**Manatí Medical Center**

There is evidence of a brief hospitalization from August 14 to August 16, 2013. Ortiz had fainted, and had fever and excessive sweat. An echocardiogram, carotid Doppler, and head CT scan were performed. He was diagnosed with syncope, hypertension, and hyperlipidemia, and prescribed medications. Exh. 1F at Tr. 128-146.

**Doctors' Center Hospital**

The record contains evidence from April 2 to April 29, 2016, from Doctors' Center Hospital. Exhs. 12F to 19F at Tr. 291-339, 733-876. Since the issue concerning us here is Ortiz's mental condition, I will only mention here what Ortiz mentioned in his memorandum regarding this evidence, that he was treated for pancreatitis, gallstones, and hepatic steatosis; underwent gallbladder surgery; that a pelvic CT showed moderate to severe degenerative changes in the thoracolumbar spine; and that Dr. Caussade noted the surgery in his progress notes of April and May 2016. Tr. 368-369.

**Dr. Samuel Padilla**

The record contains progress notes and lab work dated June 2004 to December 2014 for treatment by Dr. Samuel Padilla, internal medicine, evidently for high blood pressure and other physical conditions. The handwriting is illegible, and it appears from the memoranda submitted by the parties that this evidence is not at issue. Therefore, I will not review it. Exh. 9F at Tr. 170-277, 608-715.

*Procedural History*

Ortiz applied for disability insurance benefits on March 7, 2014, claiming to have been disabled since December 31, 2012 (alleged onset date) due to anxiety, depression, and other conditions. Tr. 48, 98, 372-73, 472-478. He last met the insured status requirements on December 31, 2017 (date last insured, "DLI").[3] Tr. 483.

In a function report dated April 2014, Ortiz's wife, Sonia Rolón, stated that Ortiz's condition kept him from concentrating and socializing with others, as was required by his job. He could pay attention for ten to twenty minutes, could not follow written or spoken instructions, and got along fine with and respected authority figures. He handled stress with medications. He handled changes in routine uncomfortably because he used to be independent and now he would get upset because he was not able to do things like before. She reminded him to self-care (bathe, shave, use the toilet, change clothes; she has found him soiled a few times at night) and to take his medications (when and how much to take). After breakfast, Ortiz wandered around the house, disoriented. He'd go to his room and wanted to be alone. He was disorganized and could not finish what he started because he was forgetful, or because he would hear voices, start crying, and suffer

---

[3] Exh. 4D (Certified Earnings Records) points to a DLI of December 2018, while the ALJ's decision and other paperwork states that the DLI was December 31, 2017. Tr. 50, 372, 483, 486.

a breakdown. He would also hear voices when attempting to watch television. At night, his condition affected his ability to sleep, and he would wander around the house, talking to himself, and hearing voices. Ortiz barely left the house, but could still drive, although he would forget directions and didn't feel safe driving by himself. They would go shopping together two to three times a week for around thirty to forty minutes, depending on his mood. They would also go "[t]o routine appointments, and I take him with me when we are invited to an activity; however, we do not spend too much time in there." He was having problems getting along with people because everything bothered him, and he thought people laughed at him and talked about him. He could not manage funds. Exh. 4E at Tr. 112-118, 504-511.

The case was referred to Dr. Edelmiro Rodríguez ("Dr. Rodríguez"), psychiatrist, for a consultative psychiatric examination. On evaluation, performed on April 28, 2014, Ortiz and his wife stated that his emotional condition deteriorated due to work pressure and feelings of anger, hostility, and anxiety, until he became unable to work in December 2012. He began psychiatric treatment in February 2013 with Dr. Caussade, who prescribed medications. There is no history of psychiatric hospitalization. His symptoms included anxiety, despair, distraction, auditory hallucinations, anger, sadness, and restlessness. During the day, Ortiz rested, paced around that house, and ate all day, but for periods of poor appetite. He did not do chores or go shopping, but sometimes drove. At times, he needed encouragement for personal hygiene. At home, he barely spoke, barely watched television or listened to the radio, but read the Bible, and did not participate in social, cultural, or sports activities, except for going to church. He got along well with his family but did not relate with his neighbors.

Dr. Rodríguez noted a sad expression, sad mood, and blunted and constricted affect. His speech was low, weak, and moderately spontaneous. Ortiz was well oriented to place, person, and time. He appeared to be in good contact with reality. His attention and concentration were fair, and he would be easily distracted. His thoughts were coherent and relevant, and his thought content did not present phobias, delusions, paranoia, grandiose or religious ideation, obsessions, ideas of reference, or suicidal or homicidal ideation. His recent memory was good, his immediate and remote memory were fair, and his short-term memory was poor. His judgment and insight (understanding about his emotional condition) were good. Dr. Rodríguez diagnosed Generalized Anxiety Disorder, Depressive Disorder NOS (ruling out Major Depressive Disorder), with a guarded prognosis, and fairly able to manage funds. Exh. 4F at Tr. 583-585.

Dr. Jennifer Cortés, non-examining psychologist, assessed in May 2, 2014 that Ortiz had a moderate condition, with moderate restrictions of activities of daily living, moderate difficulties in maintaining social functioning, and in maintaining concentration, persistence, or pace, with no repeated episodes of decompensation, each of extended duration. Ortiz could understand, remember, and execute simple one or two-step instructions; maintain attention, sustain concentration, persistence, or pace; adapt to changes; and interact adequately with others. Dr. Cortés opined that Dr. Caussade's findings were inconsistent with Dr. Rodríguez's finding, and thus Ortiz's allegations of symptoms were only partially credible and not fully supported by the medical evidence. She further noted that the medications prescribed were not standard to treat a severe condition, that Ortiz has no history of hospitalization, and he was not prescribed antipsychotics for his auditory hallucinations. Exh. 2A at Tr. 379-383.

The claim was denied on May 2, 2014, with a finding that Ortiz's emotional condition did not preclude him from working, and that he could perform tasks requiring less physical and/or mental exertion that the one required by his past job.  Tr. 48; Exh. 1A at Tr. 371; Exh. 3B at Tr. 98, 404.

In June 2014, Ortiz requested reconsideration, and his wife filed another report claiming that he was very anxious, angry, very depressed, no longer tolerated anything, and cried. He only wanted to be alone in his room, or would wander around the house, and did not want to go out. He would get upset with her when she tried to give him his medication. She continued to monitor his self-care. Tr. 408; Exh. 7E at Tr. 121-125, 521-525.

The case was referred to Dr. Jesús Soto ("Dr. Soto") on reconsideration. Dr. Soto found no changes in functional limitations, and affirmed on August 28, 2014 Dr. Cortés' assessment as written. Exh. 3A at Tr. 391-397.

The claim was denied on reconsideration on August 28, 2014, affirming the initial assessment, and that Ortiz's heart and emotional condition did not preclude him from working. Ortiz's mental RFC was assessed at unskilled work. Tr. 48; Exh. 3A at Tr. 397; Exh. 4A at Tr. 400; Exh. 5B at Tr. 102, 409.

At Ortiz's request (Tr. 411-413), a hearing was held before ALJ Angel Viera on February 2, 2017. Ortiz and Vocational Expert ("VE") Dr. Ariel Cintrón testified. Tr. 64-87. Ortiz testified that he used to work as a debt collector officer for almost thirty years, mostly on the street visiting clients, but he started becoming forgetful, agitated, irritable, and restless. He lost his appetite and

could not sleep. He was performing poorly at work and his supervisors were demanding better productivity. Ortiz quit his job when he realized that he was not remembering his supervisor's instructions and that he was failing at his job. He also testified that he quit because he was very irritated and wanted to avoid a worse situation than the one he was already in. At home, he tried to do things but would not finish what he started. He started seeing Dr. Caussade on a monthly basis. He was hospitalized twice in April 2016, for pancreatitis and then to have his gallbladder extracted. At the time of the hospitalization, he was being dialyzed. He still felt a lot of pain in his body. In addition, he could not sleep, and he heard voices calling his name. He would start wandering around the house searching for the source of the voices. Dr. Caussade gave him medications, but since they could cause liver damage, Dr. Caussade lowered the dose. At the time of the hearing, he was taking daily Norvasc 5 mg for high blood pressure, Doxepin 10 mg to sleep, Klonopin 0.5 mg, Zoloft 25mg, Zantac 300 mg, Ambien 5 mg, and Lisinopril 20 mg. He still had a hard time resting, and still heard voices. Even with medications, he could only sleep two or three hours. He'd get anxious, start walking around the house sleepless, and ate candy. He gained weight. However, his wife cooked for him but he wouldn't be hungry. He didn't do house chores (his wife did) and he had no hobbies. He tried watching television but would get tired or he couldn't concentrate on what was being broadcasted. Before, he liked spending time with everyone. Now, he did not like spending time with anyone, and tried to be alone at home. His relationship with his family changed because he did not communicate with them, and he had no relationship with his neighbors. He would even tell his sons to leave him alone.  Tr. 67-84.

The ALJ then offered to the VE the following information as to Ortiz. Ortiz formally stopped working on January 3, 2013, as per an employment certification. At Step Two, Ortiz had a severe condition of a mentally affective character which did not meet or equal a listing at Step Three, but that Ortiz had non-exertional limitations as a result of his mental condition. He could carry out simple, routine, and repetitive tasks. His judgment was limited to simple decisions. He could have frequent contact with supervisors and co-workers, and occasional contact with the public. His ability to handle changes in the work environment was limited to simple situations. The VE testified that Ortiz's job as a collection agent was classified as medium semi-skilled work (SVP 4). This job has frequent contact with the public. Ortiz would not be able to perform this job on a sustained basis, but that a hypothetical person with the limitations previously expressed could work as a labeling machine operator or machine feeder in any industry, or as a production helper

in the canned and preserved industry. These three jobs are medium unskilled, routine and repetitive work with very few work changes (SVP 2). Tr. 85-87.

On March 7, 2017, the ALJ found that Ortiz was not disabled under sections 216(i) and 223(d) of the Act. Tr. 42-62. The ALJ sequentially found that Ortiz:

(1) had not engaged in substantial gainful activity since his alleged onset through the date last insured (Tr. 50);

(2) had a severe impairment: Major Depressive Disorder, recurrent, severe (Tr. 50);

(3) did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526) (Tr. 51);

(4) could not perform past relevant work as a collection agent (light semi-skilled job) but retained the RFC to perform a full range of work at all exertional levels, but with the following non-exertional limitations: perform simple, routine, and repetitive tasks; make simple work-related decisions; adjust to simple changes in the work place; and have frequent contact with supervisors and co-workers, and occasional contact with the public. (Tr. 52, 56); and

(5) as per his age, education, work experience, and RFC, there were unskilled jobs that existed in significant numbers in the national economy that Ortiz could perform. Tr. 57.

At Step Two, the ALJ found that Ortiz's medically determinable mental condition significantly limited his ability to perform basic work activities as required by SSRs 85-28 and 96-3p. The ALJ also found that the record contained different psychiatric diagnoses, but that the decision addressed all the limitations Ortiz alleged or so found in the record, "no matter how his mental impairment was coded or characterized by diverse clinicians." The ALJ also found that Ortiz had other non-severe physical conditions, such as arterial hypertension, which was managed and controlled by medications, and pancreatitis and acute renal failure, which were resolved. Tr. 50-51.

At Step Three, the ALJ considered Listing 12.04 and found that Ortiz's mental condition did not meet or medically equal the criteria its paragraph B because Ortiz had only moderate limitations in his ability to understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt and manage himself. The ALJ cited findings by Dr. Rodríguez and Dr. Cortés. Tr. 51-52.

When making the RFC findings, the ALJ added that he found that Ortiz's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that Ortiz's and his wife's statements concerning intensity, persistence, and limiting effects were not consistent with the medical evidence and other evidence in the record, and thus gave their statements little weight. The ALJ noted that monthly treatment with his psychiatrist consisted mainly of psychiatric medications, and no history of hospitalization, participation in psychotherapy, or mental health counseling. While both Ortiz and his wife reported symptoms of anger, anxiety, and poor tolerance, there was no indication that he suffered cognitive difficulties. The ALJ also discredited Ortiz's claim of extreme limitations in concentration and focus because Ortiz could and still drove, and that activity required constant attention, decision-making, the use of judgment, and the ability to react quickly. While Ortiz reported trouble sleeping, the treating psychiatrist's notes refer to Ortiz sleeping "fairly well." Also, observations by Dr. Rodríguez indicate that Ortiz had fair memory, attention, concentration, and general knowledge, and good insight and judgment. Tr. 53-55.

The ALJ gave little weight to the opinion of treating psychiatrist Dr. Caussade, who assessed that Ortiz was unable to work, because his findings were inconsistent with those by Dr. Rodríguez and claimant's daily activities, such as driving. When considering opinion evidence in accordance with the requirements of 20 C.F.R. § 404.1527, the ALJ gave significant weight to the assessments by Dr. Rodríguez, Dr. Cortés, and Dr. Soto that Ortiz had minimal difficulty on his mental status examination in spite of demonstrating some psychiatric symptoms, and that Ortiz could perform simple instructions, work-place procedures, and work-related decisions because this was consistent with Ortiz's minimal psychiatric treatment, Dr. Rodríguez's examination, and his daily activities. The ALJ gave partial weight to the findings by Dr. Cortés and Dr. Soto that Ortiz had moderate limitations in sustaining attention, maintaining a regular schedule, and interacting with the public; and that he could interact appropriately with supervisors and co-workers, because these doctors could have been more specific regarding functionality, and because the ALJ assessed that Ortiz was more significantly limited in his ability to interact with supervisors and co-workers (hence, the frequent interaction restriction). Tr. 54-56.

Ortiz requested review of the ALJ's decision, and submitted additional treatment notes from Dr. Caussade dated March 2017 to April 2018, which are handwritten and illegible. Tr. 15-36, 63, 470. The Appeals Council ("AC") denied the request on November 14, 2018, finding that

the new evidence from February 14, 2017 did not show a reasonable probability of changing the outcome of the ALJ's decision, and that the new evidence from March 2017 through April 2018 (Tr. 15-32) did not relate to the period at issue because it dates after the ALJ's decision, and therefore did not affect the decision outcome. Tr. 1-8, 15-32, 63. The AC's notice rendered the ALJ's decision the final decision of the Commissioner. Tr. 1. The present complaint followed. Dkt. No. 1.

## DISCUSSION

This court must determine whether there is substantial evidence to support the ALJ's determination at step five in the sequential evaluation process that based on Ortiz's age, education, work experience, and RFC, there was work in the national economy that he could perform, thus rendering him not disabled within the meaning of the Act. Ortiz argues that the ALJ should have given controlling weight to Dr. Caussade's opinion, but instead gave more weight to the opinions of the consultative and non-examining physicians, as per 20 C.F.R. § 404.1527(c)(1). Second, Ortiz argues that the ALJ disregarded his allegations of symptoms and limitations. The Commissioner contends that the ALJ's RFC assessment is supported by substantial evidence.

Here, the ALJ determined that through the date last insured, and based on the record evidence, Ortiz could not perform past relevant work but retained the RFC to perform a full range of work at all exertional levels, but limited to the following non-exertional limitations. Ortiz could perform simple, routine, and repetitive tasks; make simple work-related decisions; adjust to simple changes in the work place; and have frequent contact with supervisors and co-workers, and occasional contact with the public. A review of the hearing transcript shows that this RFC finding was used by the ALJ to pose the hypothetical question to the VE.

The ALJ is required to express a claimant's impairments in terms of work-related functions or mental activities, and a VE's testimony is relevant to the inquiry insofar as the hypothetical questions posed by the ALJ to the VE accurately reflect the claimant's functional work capacity. *Arocho v. Sec'y of Health and Human Services*, 670 F.2d 374, 375 (1st Cir. 1982). In other words, a VE's testimony must be predicated on a supportable RFC assessment. *See* 20 C.F.R. § 404.1520(g)(1). An RFC assessment is "ultimately an administrative determination reserved to the Commissioner." *Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007) (*citing* 20 C.F.R. §§ 416.927(e)(2), 416.946). But because "a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function

in the workplace." *Id.* Also, when determining which work-related limitations to include in the hypothetical question, the ALJ must: (1) weigh the credibility of a claimant's subjective complaints, and (2) determine what weight to assign the medical opinions and assessment of record. *See* 20 C.F.R. §§ 404.1527, 404.1529.

Ortiz points to findings by the ALJ regarding conflicting evidence, such as that the ALJ erred in finding that Dr. Caussade's opinion of functional restrictions was inconsistent with the "minimal psychiatric treatment" found in his treatment notes, or Dr. Rodríguez's findings versus those contained in Dr. Caussade's treatment notes. While a claimant is responsible for providing the evidence of an impairment and its severity, the ALJ is responsible for resolving any evidentiary conflicts and determining the claimant's RFC. 20 C.F.R. § 404.1545(a)(3); *see also Tremblay v. Sec'y of Health & Human Servs.*, 676 F.2d 11, 12 (1st Cir. 1982).

Upon review of the record, it appears that treatment has remained rather the same throughout the years, without apparent signs of improvement, but no worsening. So, precisely the ALJ's job here was to figure out what Ortiz could do work-wise, if anything, with Ortiz's ongoing mental condition. A claimant seeking disability benefits based upon mental illness must establish that it impedes him from performing the basic mental demands of competitive remunerative unskilled work on a sustained basis, that is: (1) understand, remember, and carry out simple instructions; (2) respond appropriately to supervision, coworker, and usual work situations; and (3) deal with changes in a routine work setting. *Ortiz*, 890 F.2d 520, 526 (1st Cir. 1989) (*quoting* SSR 85-15); *See* 20 C.F.R. § 404.1568; Social Security Ruling ("SSR") 96-9p, 1996 WL 374185, at *9 (SSA 1996). For a claimant to understand, carry out, and remember simple instructions in any job, he must have the mental ability to remember very short and simple instructions, and the "ability to maintain concentration and attention for extended periods (the approximately 2-hour segments between arrival and first break, lunch, second break, and departure)." SSA's Program Operations Manual System ("POMS") DI 25020.010(B)(2)(a). "Concentration, persistence, or pace refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings." 20 C.F.R. Pt. 404, Subpt. P, App. 1, §12.00(C)(3).

As defined above, an ALJ's RFC assessment is based on the completion of tasks within the extended periods of the work day, and the ALJ is not required to phrase the RFC finding in terms of hours per day. Clearly, Ortiz's ability for concentration, persistence, or pace is limited as per all

the records considered by the ALJ, including Ortiz's subjective complaints and testimony. To what extent though? Dr. Caussade documented Ortiz's symptoms from 2013 to 2017, showcasing Ortiz's difficulty concentrating, his forgetfulness, his poor attention span, and his inability to complete tasks such as house chores. And I note that, while Ortiz was compliant with his medication intake, Dr. Caussade noted only minor symptomatic relief, yet treatment remained basically the same throughout, and there appears to be no other evidence of alternative treatment plans to seek improvement.

Dr. Caussade assessed in 2014 that Ortiz would be unable to focus attention on or persist at a task, and that he would be unable to complete a normal workday without interruption. In 2016, Dr. Caussade added in a second assessment that Ortiz was moderately limited in his ability to understand and remember short and simple instructions, and markedly limited in his ability to sustain concentration and persistence and to socially interact. He found no limitation in Ortiz's ability to ask simple questions and request assistance. Dr. Rodríguez also noted that Ortiz was easily distracted. His attention and concentration were fair. However, his recent memory was good, although his immediate memory was fair, and his short-term memory was poor. His thoughts were coherent and relevant. His judgment and insight were good. In both Dr. Caussade's and Dr. Rodríguez's records, Ortiz's refusal to participate in group activities is clear. Ortiz did not like being around people, but there is no evidence that he could not be around people, such as when he goes to church, or shopping, or to appointments. His wife reported that Ortiz got along fine with and respected authority figures. She added that she would take him to activities when they were invited, although they wouldn't stay for long. She also reported that he handled changes in routine uncomfortably because he was no longer as independent as before, but not that he could not. And Ortiz testified that he quit because he was aware that he was having trouble remembering the instructions given by his supervisor for a job above the assessed mental RFC. Dr. Cortés assessed that Ortiz had moderate restrictions of activities of daily living; moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. Dr. Cortés noted that the medication regime was not standard to treat a severe condition.

To better understand the assessments above, it is relevant to understand the five-point rating scale contained in 20 C.F.R., Pt. 404, Subpt. P, App. 1, 12.00 Mental Disorders. The effects of a mental disorder are evaluated on each of the four areas of mental functioning based on a five-

point rating scale consisting of none, mild, moderate, marked, and extreme limitation. No limitation means that a claimant is able to function in this area independently, appropriately, effectively, and on a sustained basis. Mild limitation means that a claimant's functioning independently, appropriately, effectively, and on a sustained basis is slightly limited. In moderate limitations, functioning in this area independently, appropriately, effectively, and on a sustained basis is fair. Marked limitation is when functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited. Finally, an extreme limitation means that a claimant is not able to function independently, appropriately, effectively, and on a sustained basis.

The evidence in the record shows that Ortiz's ability to perform the basic mental demands of competitive remunerative unskilled work on a sustained basis is fair, that is, moderately limited as assessed by Dr. Cortés and in part by Dr. Caussade. I thus find that there is substantial evidence in the record from different treating and consultative sources, including Ortiz's own testimony, that supports a finding that Ortiz could perform as assessed by the ALJ.

Additionally, Ortiz contends that because the consultative and non-examining opinions are dated 2014, they did not take into consideration later progress notes by Dr. Caussade. While it is certainly evident that Ortiz has a lengthy history of psychiatric treatment with Dr. Caussade, 20 C.F.R. § 1527(c)(2) and SSR 96-2p,[4] as argued by the Commissioner, instruct that a treating source's opinion is entitled to controlling weight only to the extent that it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence of record. The ALJ did not give controlling weight to Dr. Caussade's opinion, finding that the severity of the restrictions offered by Dr. Caussade were inconsistent with other medical evidence in the record, which is a valid reason to discount a medical assessment. Once the ALJ decides what weight to give a treating source, under the "good reasons" requirement, he is required to include in the notice of determination "specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p. The ALJ may reject a treating physician's opinion when it is not supported by clinical evidence or is inconsistent

---

[4] SSR 96-2p was rescinded effective March 27, 2017 but was still in effect at the date of the ALJ's decision.

with other evidence in the record. 20 C.F.R. § 404.1527(d)(2); *Arias v. Comm'r Soc. Sec'y*, 70 F. App'x 595, 598 (1st Cir. 2003). The ALJ's decision contains a lengthy summary of the treating, examining, and consultative opinions the ALJ considered, and a specific statement of the reasoning behind the weight assigned, which I find was sufficient to give the court notice of the weight given to the medical opinions and constitutes substantial evidence supporting the ALJ's determination.

Finally, Ortiz argues that the ALJ discounted his subjective complaints. I disagree and find that there is substantial evidence in the record to support the ALJ's findings as to the intensity and effects of Ortiz's symptoms. *Avery v. Secretary of Health and Human Services*, 797 F.2d 19 (1st Cir. 1986), explains that an ALJ's assessment of disability is a two-step process. The Act first requires that there must be a clinically determinable medical impairment that can reasonably be expected to produce the symptoms alleged. *Avery*, 797 F.2d at 21. Then, the ALJ must consider other evidence, including a claimant or doctor's statements "consistent with the medical findings." *Id.* Statements of subjective pain that are inconsistent with objective findings do not need to be given weight, but consistent, credible statements may "permit a finding of disability where the medical findings alone would not." *Id.* The *Avery* factors are: "(1) the nature, location, onset, duration, frequency, radiation, and intensity of pain; (2) precipitating and aggravating factors such as movement, activity, and environmental conditions; (3) type, dosage, effectiveness, and adverse side effects of pain medications; (4) treatment for relief of pain; (5) functional restrictions; and (6) daily activities. *See Id.* at 29.

The ALJ underwent the two-step process, discussing the *Avery* factors and finding that Ortiz's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but his statements concerning intensity, persistence, and limiting effects were not entirely consistent with the medical evidence and other evidence in the record. The discussion contained at Tr. 53-55 sheds light as to why the ALJ found that Ortiz's allegations were inconsistent with the record evidence. I note that, for starters, treatment by Dr. Caussade for Ortiz's symptoms remained basically unchanged, and the non-treating physicians noted that such treatment was not standard to treat the severity of symptoms as alleged by Ortiz. Ortiz reported hearing voices, but was only briefly prescribed medications for the hallucinations. Ortiz reported suffering from insomnia, but evidence from Dr. Caussade's record indicates that after starting medications the symptoms remained but he slept better. Ortiz reported preferring staying home and being alone, but there is evidence that he would leave the house, drive, go to appointments, grocery shopping,

church, and to activities upon invitation, as reported by his wife. Also, Dr. Rodríguez's findings as to Ortiz's mental limitations and Dr. Cortés' assessment indicate that Ortiz's symptoms were not as severe as those reported by Ortiz, his wife, and Dr. Caussade.

Ultimately, it is the Commissioner's responsibility to determine issues of credibility, draw inferences from the record evidence, and resolve conflicts in the evidence (*see Ortiz*, 955 F.2d at 769 (citing *Rodríguez*, 647 F.2d at 222); *Evangelista v. Sec'y of Health & Human Servs.*, 826 F.2d 136, 141 (1st Cir. 1987)). After thoroughly and carefully reviewing the record, I find that there is substantial evidence to support the ALJ's RFC finding.

## CONCLUSION

For the foregoing reasons, the Commissioner's decision is **AFFIRMED**.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 30th day of September, 2020.

*s/ Bruce J. McGiverin*
BRUCE J. MCGIVERIN
United States Magistrate Judge